UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA )
 )
    vs. ) 09 CR 650 (DEW)
 )
HAROLD TURNER )

**MOTION *IN LIMINE* TO PRECLUDE EVIDENCE OR CROSS-EXAMINATION REGARDING THE DEFENDANT'S BELIEFS CONCERNING RACE**

The defendant, Harold Turner, moves in limine to preclude the admission at trial, or reference during the trial, to evidence of his beliefs on matters of race or ethnicity, any statements he made with regard to race or ethnicity, or his membership in any organization with racist views which might be imputed to him. Much of the government's cross-examination at the last trial concerned these matters which were either entirely irrelevant pursuant to Rule 402, Fed. R. Evid., or whose relevance was so attenuated that, given their inflammatory nature, they should be excluded pursuant to Rule 403. Even a small mention of matters of racial beliefs at a trial has a well-recognized tendency to distract jurors from the actual issues at hand. United States v. Barber, 80 F.3d 964, 967-68 (4th Cir. 1996) (en banc) (raising issue of racial prejudice may "divert the trial's focus from the guilt or innocence of the defendant to peripheral factors" and "tend to subvert the court's express admonition to jurors to convict or acquit only on the evidence before them"). The focus in this case should not be on

distracting matters like race, which have no relevance to the charges here, but on the fundamental question whether Mr. Turner's statements on June 2 and 3, 2009, were actually threats, and what his intent was in making them.

## Background

At the very commencement of the first trial in this case, the government bluntly opened with the charge that "[Mr. Turner's] a racist," and went on to say that his "racial views" attracted dangerous people whom he incited to commit crimes of violence.  T. 201.  The government went on to address Mr. Turner's "personal constitutional views," and the defense objected that the government was "bringing in all views" and that "Mr. Turner is here for one view, June 2 and June 3 postings." T. 202.  The court instructed the jury that this was "not evidence" and the it should decide the case on the law, but let the government continue.  T. 202.  The government's opening went on to contain further such gratuitous remarks.  T. 212, 222.

In light of the government's irrelevant characterization of him as a racist at the first trial, at the second, Mr. Turner denied that he was a racist or that he believed racist statements he made on his blog.  TT. 267.  On direct examination, he testified that there had been nothing racist about his radio show, which began in 2000, but there had been a change in format to get listeners.  291-92.  He acknowledged that in 2005 he had a following on the radio due to racist remarks and violent

rhetoric, but that he did not personally believe racist statements. TT. 340-41, 362. At one point, when Mr. Turner offered in evidence a recording of his radio show which contained both racist remarks as well as language about a person deserving to be killed, the Court ruled that the racist remarks were not relevant, and permitted only the portion with respect to violence to be played. TT. 392-93.

In its cross-examination, the immediate subject matter of the government's questioning was the racially inflammatory statements that Mr. Turner had made. The government first elicited that Mr. Turner had testified that he was not a racist and had at some point not engaged in violent rhetoric, and Mr. Turner agreed. TT. 468. Mr. Turner had actually testified only that in the early period of his radio show he had not engaged in racist rhetoric, TT. 292, but that by 2005 he had been making "racist remarks" on the radio. TT. 340-41, 362. On cross-examination, the government represented to him that he had testified that he had not engaged in such rhetoric until 2003 after meeting Agent Haug, and Mr. Turner agreed this had been his testimony, although it was not. TT. 468.

The government then questioned Mr. Turner about newspaper article published on February 23, 2003, that claimed that on his radio show he had "described Chicago at that point as an urban cesspool full of savage Negro beasts, filthy Hispanics and Jews." The government offered him Government's Exhibit (GX) 115, to

refresh his recollection. 470. The government also brought out the more relevant point that Mr. Turner had said that he did not think that killing a federal judge would be wrong, though it would be illegal. 471.

After questions about such violent rhetoric, the government asked Mr. Turner whether on September 21, 2002, he spoke in his blog about "filthy brown-skinned beasts fingering America." TT. 474. Then it questioned about his statements concerning "FBI agents being attacked and beaten and dragged into Mexico by savage spics" and stating "you should pick up your rifles, sighting the long range scope and start gunning down these Mexican animals in the desert, if we pile up enough dead Mexicans maybe the stench of rotting corpses will reach Washington." TT. 474.

The government went on to ask about a blog post from October, 2002, that addressed the shootings by snipers of people in the Washington, D.C., area. It questioned whether Mr. Turner had called the snipers "savage Negro beast sniper suspects." TT. 475. It questioned him about a subsequent statement about one of the snipers "looking like a savage Negro beast or perhaps a filthy mixed race Muslim scumbag." TT. 476. The government then pointed to another blog post from October, 2002, that had a "suggestion for Halloween, Ku Klux Klan outfit." TT. 477. The post stated that if thousands of people wore such a costume, it would "send a very distinct message about your beliefs at the

same time; imagine what would happen if thousands of people did this ... and every left wing group would be in a panic." TT. 477.

The government then brought out a statement that, because the government said it could not apprehend all illegal aliens, "we should do drive-by shootings with machine guns at every Mexican consulate and kill every single one of these invaders and don't bother telling me that it's illegal ...," and that "Mexican filth" was doing the invading. TT. 477-78.

The government repeatedly inquired into whether Mr. Turner was himself a racist. It asked, "Isn't it true that you were a member of the Aryan Nation well before that?", and Mr. Turner denied that he had been a member. TT. 478-79. It later pursued the issue, asking whether "you, yourself, you would have us believe, were not a racist at the time." TT. 486. And further, it asked, "despite the other blog postings I showed you, Exhibits 111, 12, 13, you would have this jury believe you were not a racist in 2002, correct?" TT. 487. And when it asked if a rival of Mr. Turner's was a white supremacist, it gratuitously added, "like you"? TT. 528. Mr. Turner denied these allegations.

The government again noted Mr. Turner's "multiple racist and bigoted remarks" and asked him whether he was "a racist" or "a bigot" or "hate[d] Jews" or "hate[d] blacks" or "Mexicans"? Mr. Turner denied the allegations. TT 572.

The government singled out yet another blog post from

January 16, 2009:

> The faces in the crowd you will see at the inaugural crowd will look like a scene from Planet of the Apes.  To the average American viewer, there will not be a single more powerful image that I or anyone else could offer to show just how different and completely inferior they truly are.  That intermixed in the huddled mass of subhuman simians will be mentally ill whites who call themselves liberal and think ti's eve so grand that the first black president will be sworn in."

TT. 575.  The court received the post as substantive evidence, though the government made no proffer of what this post tended to show that was actually in issue in the case.  TT. 576.

There were throughout the remainder of Mr. Turner's testimony, a number of further gratuitous references to his postings containing racial slurs and his personal beliefs.  See, e.g., TT. 614-18.

**ARGUMENT**

The Court should preclude the government from introducing evidence or conducting cross-examination on Mr. Turner's beliefs on racial or ethnic matters, which are strictly speaking irrelevant to this case.  This case concerns only whether certain statements Mr. Turner made in June, 2009, which had no racial content, were threats, whether Mr. Turner had the requisite intent, which has nothing to do with race, and whether the affirmative defense the court charged, on which race had no bearing, was made out.  Similarly, evidence and questioning concerning Mr. Turner's prior statements or blog posts regarding racial matters are irrelevant since they say nothing about the

actual issues in the case; even if they had some relevance, their slim probative value would be vastly outweighed by their substantial inflammatory and prejudicial effect.

Evidence in this case of Mr. Turner's views on matters of race, his actual membership in racist organizations, or not, and his prior statements concerning racial matters is irrelevant and should be excluded at the third trial. The actual issues in this case concern only the nature of certain statements Mr. Turner made on June 2 and 3, 2009, his intent in making them, and whether he has made out the affirmative defense charged by the Court, arising from his former relationship with the FBI. None of these issues concerns Mr. Turner's views on race or his actual membership in racist organizations. Because Mr. Turner's views on race or membership in racist organizations do not "make any fact that is of consequence" to these issues more or less likely, they are irrelevant and inadmissible. Rules 401, 402, Fed. R. Evid; see Dawson v. Delaware, 503 U.S. 159, (1992) (membership in racist gang irrelevant); United States v. Kallin, 50 F.3d 689, 696 (9th Cir. 1995) (evidence that the defendant "dislike[d] Mexicans" irrelevant). Such views are irrelevant in a case charging threats, where the views play no part in the communication of the alleged threat. See United States v. Cooper, 865 F.2d 83, 85 (4th Cir. 1989) (political views of defendant irrelevant because they were not part of conversation in which threats were stated). Indeed, in this case, at one

point where the defense sought to introduce evidence of Mr. Turner's racial remarks, the Court ruled them irrelevant and excluded them.  TT. 392-93.

Proof of racial views or associations or statements may, of course, be admissible where they tend to show some matter actually in issue, such as a defendant's motive or a witness's bias.  See, e.g., United States v. Abel, 469 U.S. 45 (1984) (membership in racist gang admissible to show defense witness's bias in favor of the defense); United States v. Seale, 600 F.3d 473, 495 (5th Cir. 2010) (membership in Ku Klux Klan and of "racial animus" relevant to show motive).  In this case, there is no such substantive basis for admitting evidence of Mr. Turner's racial views or related evidence.

In this case, at the last trial, the government purportedly raised these issues to contradict Mr. Turner's testimony that he was "not a racist" and that at some early point in his radio show he did not engage in racist rhetoric.  These latter matters were, of course, irrelevant themselves, since this case has nothing to do with Mr. Turner's alleged racial bias or rhetoric.  In any event, at the next trial in the case, Mr. Turner has no intent to put in issue either his racial beliefs, any evidence of his statements on racial matters, or the chronology of just when he first adopted strident racial rhetoric, and under those circumstances, the government's cross-examination into these matters will be wholly without basis.

There is one related area that will have to come out as part of the background of the case, and to which the defense does not object. The apparent basis for the government's enlisting Mr. Turner as a confidential informant was that he was popular among members of white supremacist groups, and Mr. Turner provided information on the activities of such groups. These facts will have to come out as part of the events in issue. But the raising of these facts does not require any inquiry into whether Mr. Turner was an actual member of such groups or shared their views, much less into the racial rhetoric he used on his blog or elsewhere.

Since Mr. Turner's membership in white supremacist groups, or not, his beliefs on race, and statements he made addressing race were irrelevant in this case, or were far more prejudicial than probative, the Court should exclude evidence or inquiries concerning these matters at the next trial.

WHEREFORE, the defendant Harold Turner respectfully requests that his motion *in limine* be granted.

Respectfully submitted,

PETER KIRCHHEIMER
DAVID A. LEWIS
Federal Defenders of New York, Inc.
1 Pierrepont Plaza, 16th Floor
Brooklyn, New York 11201