UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA    )
                                 )   No. 09 CR 650
         vs.               )   Judge Donald E. Walter
                                 )
HAROLD TURNER               )

## GOVERNMENT'S SENTENCING MEMORANDUM

      The United States of America, by its attorney, Patrick J. Fitzgerald, United States Attorney for the Northern District of Illinois, respectfully presents this Sentencing Memorandum for the Court's consideration in connection with the December 21, 2010 sentencing hearing in this case.

**I.    Turner's Offense of Conviction.**

      **A.    The June 2 and 3, 2009 Postings are Threats – Not Political Hyperbole.**

      On June 2, 2009, defendant Hal Turner responded to a decision of the Seventh Circuit Court of Appeals through an Internet posting. Turner warned that "American gun owners ha[d] been put in spectacular jeopardy by [the] federal court ruling" of a three judge panel of the Seventh Circuit to uphold a Chicago ordinance banning handguns and automatic weapons within city limits. Turner proclaimed the decision to be "the most spectacular act of judicial malfeasance [he] had ever witnessed."

      But then, in an effort to intimidate the three judges, Turner switched from offering his opinion on the merits of the decision to threatening death to the judges. Turner stated that the judges, through their decision, had acted "in a manner so sleazy and cunning as to deserve the ultimate punishment." Turner claimed that the judges'

1

"entire reason for existing [was] to accrue unto themselves, power over everything" and that the government "lies, cheats, manipulates, twists and outright disobeys the supreme law and founding documents of this land" because "they" had not "faced REAL free men willing to walk up to them and kill them for their defiance and disobedience." Turner quoted Thomas Jefferson ("The tree of liberty must be replenished from time to time with the blood of tyrants and patriots.") and stated that "[i]t is time to replenish the tree!" Turner stated: "Let me be the first to say this plainly: These judges deserve to be killed. Their blood will replenish the tree of liberty. A small price to pay to assure freedom for millions." Turner labeled the judges as "traitors" and accused them of "intentionally violat[ing] the Constitution...[and] intentionally ignor[ing] a major ruling by the U.S. Supreme Court." Turner concluded: "If they [the judges] are allowed to get away with this by surviving, other Judges will act the same way. These judges deserve to [sic] made such an example of as to send a message to the entire judiciary: Obey the Constitution or die."

## B.   The June 2 and 3, 2009 Postings Are Not Protected Speech.

Turner consistently characterizes his June 2 and 3, 2009 postings as "political oratory," "political hyperbole," or, most recently, as an "exhortation to metaphorical violence." But Turner can find no refuge in these forms of protected speech. The differences between the political commentary with which Turner tries to affiliate himself and the threatening postings in this case are stark. Turner's statements in the charged postings were not general exhortations about political conditions but were instead targeted attacks against three individuals whom Turner desired to intimidate

2

by methodically identifying them and placing them before his Internet audience on a spotlit platter. Turner named the three judges in his June 2, 2009 posting and provided their photographs and work addresses in the June 3, 2009 posting.

Turner not only used violent language in his postings but he intentionally linked violent phrases and graphic images with the three judges themselves ("walk up to them and kill them"; "replenish the tree...[with] [t]heir blood") in an unrelenting drum beat of words. Turner did not stop with criticizing the judges and their decision, or even generally proclaiming, in keeping with the extreme speech of other commentators on other subjects, that the individuals with whom he disagreed (the judges) should be killed as a result of their actions. Turner, instead, and in contrast to these other broad-based examples, provided in his Internet posting the method (shooting) and the means (photographs, addresses, and maps) by which to do so. Turner's comments were neither isolated nor limited to generalized sound bites.

Most significantly, however, Turner crafted his postings so as to be personally intimidating to the three judges involved. Turner made reference in the June 2, 2009 posting to the slaying of Chicago District Court Judge Joan Lefkow's mother and husband, and coupled this reference with these words: "Apparently, the 7th U.S. Circuit court didn't get the hint after those killings. It appears another lesson is needed." This personal message to the three judges alone sets Turner's postings apart from his cited forms of protected speech.

The sole purpose of the references to Judge Lefkow's slain family and to personal information about the three Seventh Circuit judges, and the only reason Turner

3

included them, was to intimidate the judges into changing their views as to gun control laws. Turner crossed the line between protected and unprotected speech by intentionally styling his June 2 and 3, 2009 postings as he did and, in doing so, he committed a crime.

### C.   Section 115(a)(1)(B) Is Necessary to Protect Judges From Threats of Violence and Efforts to Intimidate Them.

Title 18, United States Code, Section 115(a)(1)(B), the statute of which Turner was convicted, prohibits threats to assault or murder United States judges with the intent to impede, intimidate, or interfere with them while they are engaged in the performance of their official duties or with the intent to retaliate against them on account of the performance of their official duties. The treatment of threats of this nature as unprotected speech is absolutely necessary and appropriate.

Section 115(a)(1)(B) reflects Congress's recognition that judges are vulnerable to acts of violence. Judges, for example, unlike the President of the United States, do not receive constant security protection. Congress also recognized the corrosive impact on judges from the use of threats of violence as a means to intimidate them into changing their positions. Judges, in order to uphold their oath and discharge their duties, must be able to go to work each day without fear as to the repercussions of their decisions to themselves or their families. The criminal justice system simply could not function if an individual's effort to intimidate a judge through threats of violence were protected from prosecution and punishment.

Threats of violence in general, moreover, are both unprotected by the First Amendment and inimical to it. In this case, when Turner used the Internet to issue threats of violence, he sought not to persuade, but to coerce by intimidation. Turner traded on fear of violence in a way that has no place within the marketplace of ideas. Like the other classes of punishable speech, true threats serve "no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-572 (1942).

There is another reason why threats of violence constitute unprotected speech – they instill fear in their victims. No matter whether a threatener carries out an attack, his victim lives under a cloud of uncertainty as to whether or when the threatened violence will be meted out. Seldom do threat victims have the luxury of minimizing, much less eliminating, the risk of an attack. They must carry on with their lives, facing the grim possibility of a violent attack against themselves or their loved ones.[1]

---

[1] There is also a practical and economic impact of threats of violence on the system. Threats directed at government officials and other public figures result in an expense to the public. Every credible threat on the life of a government official leads to an investigation and a series of security measures, such as the summoning of Secret Service Officers or Deputy United States Marshals for protective details.

II.     Application of Section 3553(a) Factors to Turner.

    A.     Turner's History and Characteristics.

Turner's June 2 and 3, 2009 postings represent the culmination of his progression beyond the line of protected speech. Turner's earlier public statements and private emails also demonstrate that Turner reacts with venomous fury and uses his public platforms and Internet access to instill fear when someone expresses views contrary to his own or levies criticism against him personally.

        1.     Turner's Public and Private Statements About Other Judges.

Turner has spent years trying to undermine judicial independence in all types and at all levels of courts, whether state or federal, or at the trial, appellate, or Supreme Court stages of proceedings, by attempting to coerce judges to render decisions based on fear and not on the law. Turner used his website, radio broadcasts, emails, and personal correspondence as platforms to disseminate information about judges' rulings with exhortations about violence against the judges that should be levied in response. Turner claimed during his trials in the instant case that he issued these criticisms in his public persona as a shock jock. But the hard reality is that the Turner's harsh words about these targeted judges, launched by Turner to an audience containing members of violent and extreme groups, prompted the United States Marshal's Service to assign protective details to many of the judges for extended periods of time.

The intensity of Turner's postings about judges increased substantially between April 10, 2006 and February 20, 2007, when Turner was not open as an FBI source,

and after August 2007, when the FBI closed Turner as a source for the final time. Several examples of Turner's efforts to single out particular judges, and the consequences of Turner's actions, are summarized in the government's version of the offense.

### 2.    Turner's Responses to Contrary Views and Comments.

Turner's Internet and radio broadcasts, and his email communications with particular individuals, went well beyond harsh criticism or far right-wing political commentary. Turner made statements on numerous occasions that were intentionally designed to create fear in the minds of his targets. Turner, for example, frequently invoked the specter of, and appeared to take credit for inspiring, the murders of Judge Lefkow's family in these communications. Turner also seasoned his communications with reminders that his audience – filled with members of extreme and violent groups – would heed Turner's call to arms should the conduct with which Turner disagreed did not stop. On June 2, 2009, for example, the same day as the first of the charged postings in the instant case, Turner responded to an email by "asking" the sender whether the sender still worked at the address, a location in California, listed by Turner in his email response. G.Ex. 33. Turner then informed the sender that "I'll be passing your info out to my friends in the White racist skinhead groups out on the west coast. It ought to be funny to see what happens when they catch you coming out of work." *Id.*

### 3.   Turner's Conduct After Being Charged in This Case.

Turner's characteristic tactic of trying to stop those who oppose him through the use of intimidation and fear continued even after Turner was charged in this case. The government informed Turner's counsel prior to the third trial that the government intended to call Special Agent Stephen Haug, Turner's handler agent while Turner cooperated with the FBI, as one of the witnesses at Turner's trial. On July 28, 2010, shortly after the government made this disclosure, Turner sent a series of text messages to Agent Haug in which Turner threatened to say specified things about the agent if Agent Haug dared to testify against him.[2]

### B.   The Need for the Sentence to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.

Threats to assault and murder federal judges cannot be tolerated under any circumstance. Here, however, because Turner disseminated his threat on the Internet, the crime was particularly egregious and difficult to contain. Neither the judges who were the targets of the postings nor the United States Marshal's Service, which is tasked to protect them, could recognize a member of Turner's Internet audience who could have heeded Turner's words and choose to attack one of them.

This case has been covered widely in the press and by Turner through his family's blogspot. This national coverage means that the nation knows of Turner's June 2 and 3, 2009 postings. The sentence must reflect the seriousness of the conduct to

---

[2] The government will be prepared to present testimony about these text messages at the sentencing hearing.

8

those across the nation who are aware of the language Turner used and who themselves may try to do the same thing.

Turner has also consistently demonstrated that he has no respect for the law. Turner lied under oath during his testimony in the second and third trials in an effort to distance himself from his association with white supremacist groups before becoming an FBI informant and to blame the FBI for allegedly misinstructing him about the limits of protected speech and for allegedly instructing him to make inflammatory remarks after the murder of Judge Lefkow's family. Turner also demonstrated his disregard for the seriousness of his offense by sending text messages to Agent Haug in an effort to intimidate him into silence.

### C.    The Need for the Sentence to Afford Adequate Deterrence and to Protect the Public from Further Crimes by Turner.

The sentence Turner receives in this in this case will be noticed by those so inclined to make threats and it will be remembered. Crimes of this nature cannot be treated lightly. Turner's crime requires deliberation – choosing the words to use and the method of dissemination – and a significant sentence in this case will encourage an individual inclined to engage in that process to stop before the process is completed.

Turner's own post-conviction conduct demonstrates that a significant sentence of imprisonment is required in order to protect the public from further crimes by him. Two incidents, both of which occurred while Turner has been incarcerated, are summarized below.

1.    **Smuggling Tobacco Into MDC.**

Turner has been in custody at the Metropolitan Detention Center ("MDC") in Brooklyn since his August 13, 2010 conviction in this case. On or about September 29, 2010, an MDC official informed the government that tobacco, which is considered contraband, and a photograph that had been marked "classified" had been recovered from a package sent to Turner at the MDC. The package was marked "legal mail" and bore the name and return address of one of Turner's lawyers ("Lawyer 1"). The government thereafter received from the MDC emails written by Turner and telephone conversations between Turner and family members. These communications reflect that Turner himself likely made arrangements for the tobacco to be sent to him and manipulated the system in such a way as to make it appear as if a lawyer sent the material.[3]

On August 20, 2010, Turner requested in an email that Family Member 1 mail him copies of materials he had sent to one of his lawyers. Turner stated that some of the materials were in "the blue binder on the left side" of his desk. On August 21, 2010, Turner gave Family Member 2 instructions in an email where to find a "classified satellite photo" in his materials. Later that day, Family Member 2 notified Turner by email that Family Member 2 had printed the pages Turner wanted and that it had been added to the rest of the document. Family Member 2 reported that the material

---

[3] The government has no reason to believe either that any lawyer associated with Turner was responsible for mailing to Turner the package containing the tobacco or that the photograph in the package was classified at the time the package was sent.

would be in the mail "within the hour." On August 25, 2010, Turner told Family Member 3 that he had not yet gotten the package but, later that day, Turner reported to Family Member 1 that he got "the legal mail" from one of his attorneys that day.

On September 2, 2010, Turner asked Family Member 1 by email to have Family Member 2 "print out another copy of the thing [they] had spoken about...." On September 3, 2010, Turner asked Family Member 3 to "ship two packs of Winston Light 100's (Box) in a small box to" Family Member 2. On September 9, 2010, Family Member 1 emailed Turner that one of his lawyers ("Lawyer 2") (Lawyer 2 is not affiliated with Lawyer 1) got the package that Turner had sent to Lawyer 2 "last week." Turner responded that same day that he was "[g]lad about that" because there was material in the package "that is Classified "Secret" by the Director of Central Intelligence (DCI)...." On September 10, 2010, Turner told Family Member 1 to "[p]lease make certain [Family Member 2] puts the thing [Family Member 2] worked on for me out today." Later that day, Turner asked Family Member 2 in an email "[d]id the rpoject [sic] you did for me leave today as scheduled? Answer only yes or no. No other details."

On or about September 13, 2010, three days after Turner asked Family Member 2 if the "project" had left as scheduled, the MDC received a box addressed to Turner marked "legal mail" with Lawyer 1's return address on it. The MDC processed the box as legal mail. The MDC clerk who opened the box found, among other items, a satellite photograph approximately 8½" x 11" in size marked "classified" and "secret" by the DCI (just as Turner described), which had a paper backing glued to it. The clerk gave

11

Turner all of the materials in the box but for the photograph. The MDC later determined that there was a quantity of tobacco concealed between the photograph and the backing.

On September 13, 2010, Turner sent an email to Family Members 1, 2, and 3 in which he told them that he received a box from Lawyer 1 that day and that, in the box, there was "a blue binder with some trial evidence, including a photograph with some type of backing." Turner stated that "[i]nside the photo is a sandy-type substance which the Special Investigations Service is going to test. If it is merely sand, then I will get the photo back. If it is something other than sand, I will be thrown in the hole today pending investigation." Thereafter, Family Members 2 and 3 expressed surprise to Turner in emails that Lawyer 1 put sand in a photo to Turner or that Turner would be put in the hole for "something [Turner] received from [Lawyer 1]." Turner was, in fact, placed in segregation as a result of this incident.

The emails which preceded the discovery of the tobacco in the box marked "legal mail" strongly suggest that Turner himself was responsible for arranging for the box containing the tobacco to be sent to him under the guise of "legal mail" from Lawyer 1. The quantity of tobacco concealed in the photograph, for example, appears from a photograph to be roughly equivalent to that which could be obtained from two packs of cigarettes – the quantity that Turner requested that Family Member 3 send to Family Member 2. While there are several possible reasons why Turner abused the "legal mail" system to receive tobacco in jail, the fact of the incident demonstrates both

12

Turner's disrespect for the law and his conniving way of violating rules with which he disagrees. In Turner's world, some rules simply do not apply to him.

> 2.    **Turner's Request for Personal Information about MDC Officials.**

On October 10, 2010, Turner told Family Member 2 during a telephone call to get "toothpick sized lengths of that stuff that we used around the pipes" and to make sure Family Member 2 had "two of them" for an upcoming event Turner named in the call. Turner stated words to the effect that "since it's very, very small," "one on each side of the car, it will help add weight and it won't trip anything, you know?" Turner reiterated later in the conversation that the "two toothpick sized things" could be "wrapped around the belt or something, you know, a belt buckle or something." The MDC staff members monitoring this call wrote an incident report about it due to a concern that Turner was speaking in coded language to Family Member 2 about smuggling contraband into the MDC.

On October 14, 2010, after Turner received a copy of the incident report, Turner told Family Member 2 during a telephone conversation to write down the name of an MDC employee (MDC Employee 1) and to do an "Intelius" on him first in New York and then in New Jersey. "Intelius" is an Internet site that provides personal information, such as address history and birthdates, about individuals based on the individual's name. Later, in the same conversation, Turner asked Family Member 1 to write down the name of MDC Employee 2 under the name of MDC Employee 1 and to give the names to Family Member 2 because Family Member 2 "knows what to do with that."

Turner was later placed in segregation again as a result of the incident report arising from the October 10, 2010 telephone conversation. This incident demonstrates that, even in prison following conviction for sending a threat containing personal information about three judges, Turner requested a family member to obtain personal information about MDC officials when Turner was angered with the officials for writing what Turner believed to be an unjustified incident report about him.

III.   **Government's Response to Turner's Arguments in Mitigation of Sentence.**

In this case, as is his right, Turner maintains that, despite his conviction, he is innocent. Turner has expressed no remorse, no acceptance of responsibility, and no recognition that there is anything he should have done differently. Instead, in his letters to the Court since his conviction, submissions to the probation office, and sentencing memorandum, Turner has offered arguments completely at odds with the kind of contrition that normally is a pre-condition to leniency.

A.   **Turner's Work as a Confidential Source.**

Turner was a paid source for the Federal Bureau of Investigation ("FBI") for periods of time between 2003 and 2007 due to Turner's popularity with and access to white supremacist groups.[4] Turner provided good information to the FBI during these periods of time. The relationship between the FBI and Turner, however, was a stormy

---

[4] Turner was an FBI source during the following periods: (1) June 12, 2003 through March 29, 2005; (2) May 17, 2005 through April 10, 2006; and (3) February 20, 2007 through August 1, 2007. In November 2007, an FBI Special Agent made inquires about reopening Turner as an FBI source. The FBI declined to reopen Turner and Turner was not opened as a source after these inquiries were made.

14

one. Turner maintained both an Internet site and a weekly radio broadcast for large portions of the time that he served as a source. The FBI admonished Turner about the danger of using these public forums to incite individuals to commit acts of violence based on Turner's inflammatory statements. Turner terminated himself once as a source and the FBI closed Turner twice as a source due to his dangerous rhetoric and serious control problems. On occasion after August 2007, the month in which Turner was closed as an FBI source, Turner reported to the FBI or to other law enforcement organizations information he had learned concerning the commission of violent acts.

Unmentioned, however, in Turner's lengthy submission about his work as a confidential informant is Turner's persistent efforts to extort the FBI after the FBI cut him off as a confidential source. In several emails to various FBI agents, Turner alluded to various risks of violence and withheld information from law enforcement due to his anger at the FBI or in an effort to receive money he believed the FBI still owed him. *See, e.g.,* G.Ex. 41 (email from Turner to a Deputy Marshal dated October 13, 2008 in which Turner refuses to speak to FBI Roanoke about the possible use of a truck to bomb a public building because the FBI "screwed me over badly"); G.Ex. 73 (email from Turner to FBI contact dated March 27, 2008 in which Turner stated that if hypothetically he had information about a highway sniper he could not in good conscience reveal it until the FBI paid him $5,000). Turner made clear his desire to split from law enforcement in an email to a Deputy Marshal after Turner was terminated as an FBI source. Turner wrote: "there are things taking place in the country right now that cause me to believe that corrective measures may have to be

15

imposed upon the government. Those corrective measures would probably not be legal. One of the coolest things I came to know as I got older is that force and violence do not need to be legal in order to be effective and I perceive that the US is arriving at a point where effectiveness is more important than reality." G.Ex. 46.

Turner continued to "ratchet up the rhetoric" after the FBI terminated Turner for a final time, and Turner continued taunting law enforcement. For example, on January 25, 2009, after Turner published information about a district court judge, described in Part III.A.7 of the government's version, Turner told a Deputy Marshal in an email that: "I have just outed the home town info of a federal district judge. You may wish to take appropriate steps to insure her safety." G.Ex.48.

## B.   Acceptance of Responsibility and Obstruction of Justice.

Citing Application Note 2 to Guideline §3E1.1, Turner claims his is the "rare situation[]" in which a defendant may earn acceptance of responsibility despite putting the government to its burden of proof at trial. Turner claims he truthfully admitted the "offense of conviction" and did not falsely deny relevant conduct. This is wrong on both scores.

First, Turner did *not* admit the facts that comprise the offense. Turner skips over the most important element of the crime – the mens rea – that is, whether Turner disseminated his threat with intent to impede, intimidate, and interfere with the judges or with intent to retaliate against the judges. During cross-examination, Turner flatly denied that he published his blog posting with the intent to intimidate or retaliate against the three judges. *See, e.g.*, Tr. 263 (Q: [T]his was your effort to

16

intimidate these judges, wasn't it? A: No, ma'am, and please don't tell me what my effort was, I know what I intended."). One cannot deny a factual dispute like the mens rea and claim to have accepted responsibility, just as a drug courier is ineligible for acceptance of responsibility if he denies at trial knowledge of the narcotics he transported.

Second, Turner fails to acknowledge that he offered an affirmative defense, and, in so doing, gave false testimony, meriting an enhancement for obstruction of justice. *See* Guideline §3E1.1, Application Note 4 ("Conducted resulting in an [obstruction of justice] enhancement ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct."). Though not obligated to do so, Turner testified in his own defense. Turner provided an elaborate story about "legal instructions" he received from Agent Haug regarding the legality of Turner's threats. In particular, Turner claimed that Agent Haug provided Turner with three Supreme Court cases and that Agent Haug taught Turner about the definition of "imminent lawlessness."

This testimony is completely false, as confirmed by the testimony during the third trial of Agent Haug and Detective Leonard Nerbetski. Agent Haug testified that he had never heard of the Supreme Court cases about which Turner testified Agent Haug had instructed him. Turner also lied when he testified that Agent Haug instructed him in 2005 to "ratchet up the rhetoric" following the murders of Judge Lefkow's husband and mother in an alleged effort to develop information about the identity of the murderer. Agent Haug and Detective Nerbetski denied in their

17

testimony during the third trial that Agent Haug ever gave these instructions to Turner. Turner also falsely denied in his testimony during the third trial that he sent Agent Haug text messages on July 28, 2010.

Turner's lies about the source of his knowledge of First Amendment law and the reason why he proclaimed publicly in 2005 that Judge Lefkow was "worthy of death" were relevant and material because Turner, in order to succeed with his defense, needed to convince the jury that the FBI taught him the limits of free speech and had in the past approved speech similar to that for which he was charged in the instant case. Turner knew that, if the jury believed that he (Turner) already had knowledge of the limits of free speech, or acquired it on his own after becoming an FBI source, then the jury would conclude that he (Turner) was solely responsible for the words Turner chose to place and use in the charged postings. Turner's lie about the text messages was material because Turner attempted to intimidate a key witness in the case who, if called, would significantly rebut Turner's testimony. Hence, Turner lied to conceal probative evidence of his consciousness of guilt.

## IV.   Government's Sentencing Recommendation.

The government recommends that this Court impose a sentence with an upward variance from Turner's applicable Guidelines range. A Guidelines sentence would fail to reflect the fact that Turner committed at least two separate acts of obstruction of

justice through materially false testimony in two trials and through his efforts to prevent a law enforcement officer from testifying against him.

For years, Turner has engaged in a campaign of intimidation against public officials and private citizens alike. Even Turner's arrest in this case failed to deter him. Turner continued his tactics by using intimidation against a key witness in the government's case against him. All the while, Turner has displayed defiance and no regret for his actions. Turner remains utterly incapable of acknowledging the genuine fear experienced by his innumerable victims – that is, except when *he* is the victim of a perceived threat. Turner has committed a serious crime, engaged in witness intimidation, lied repeatedly under oath, and has shown no regret whatsoever.

Dated: December 16, 2010                    Respectfully submitted,

                                            PATRICK J. FITZGERALD
                                            United States Attorney

                              By:    s/ *William E. Ridgway*
                                     William E. Ridgway
                                     Diane MacArthur
                                     Assistant United States Attorneys
                                     219 South Dearborn Street
                                     Chicago, Illinois 60604